IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **KENNETH CHARLES EADY,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No.: 2:03-CV-3065-RDP |
| ) | |
| **AMERICAN CAST IRON PIPE** ) | |
| **COMPANY, INC.,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

Pending before the court is American Cast Iron Pipe Company's ("ACIPCO") Motion for Summary Judgment (Doc. #35) filed on July 11, 2005. Plaintiff filed his complaint (Doc. #1) on November 14, 2003, seeking disability benefits pursuant to an employee and disability benefits plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The court determined in its May 4, 2005 order (Doc. #26) that the "pure" arbitrary and capricious standard of review applies, and it must now decide whether Plaintiff is entitled to ERISA benefits. As discussed more fully below, the court finds that there are no material factual disputes and that ACIPCO is entitled to judgment as a matter of law. Accordingly, ACIPCO's motion for summary judgment is due to be granted.

**II.    STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts

to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

**III.    STATEMENT OF FACTS**[1]

Plaintiff Kenneth Charles Eady began working at ACIPCO on August 6, 1973, as a crane operator. (AF No. 1.1). As an ACIPCO employee, Plaintiff participated in the American Cast Iron Pipe Company Pension Plan ("the Plan"), which is sponsored and maintained by ACIPCO. (AF No. 24.1). The Plan was created to provide eligible employees with certain retirement and disability benefits. (AF No. 25.1). ACIPCO serves as the Plan Administrator and Named Fiduciary, as those terms are defined under ERISA. (AF No. 26.1). As the Plan Administrator, ACIPCO has a number of powers that are enumerated in the Plan, including the power and duty "[t]o construe and interpret the Plan, decide all questions of eligibility, and determine the amount, manner and time of payment of any benefits. . . ." (AF No. 27.1). Under the Plan, disability retirement benefits are paid to an employee who has "a total and permanent disability" that renders him "wholly and permanently incapable of performing work for the Employer for which [he] is suited by reason of his education, training and experience . . . ." (AF No. 31.1).

---

[1] The designation "AF" stands for admitted fact and indicates a fact offered by Defendant that Plaintiff has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Whenever Plaintiff has adequately disputed a fact offered by Defendant, the court has accepted Plaintiff's version in accordance with the summary judgment standard. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendant's Statement of Facts as set forth in Doc. #30 and responded to by Plaintiff in Doc. #37. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 5.2) would indicate the second sentence of paragraph 5 of Defendant's Statement of Facts is the subject of the court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiff's Statement of Facts contained in Doc. #37 and responded to by Defendant in Doc. #39. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

On February 15, 2000, Plaintiff was placed on a four-week disciplinary suspension because of an altercation with another employee. (AF No. 2.1). On or about March 1, 2000, while he was on suspension, Dr. J.W. Pitts, the medical director at ACIPCO, diagnosed Plaintiff with hypothyroidism and chronic fatigue syndrome.[2] (AF No. 3.1). Dr. Pitts also arranged for Plaintiff to see Dr. Ashley Hagemeyer, an ACIPCO psychiatrist, for the evaluation and treatment of his depression. (AF No. 4.1). Based on his own diagnoses and the recommendation of Dr. Hagemeyer, Dr. Pitts placed Plaintiff on medical leave effective March 14, 2000. (AF No. 5.1). Dr. Pitts re-examined Plaintiff on a weekly basis after that date. (Id.)

In July 2000, ACIPCO initiated an investigation into Plaintiff's allegedly disabling condition because there were concerns that Plaintiff was taking an unusual amount of time off immediately following his disciplinary suspension and that he might be engaging in other employment while on paid medical leave. (AF No. 6.1). ACIPCO arranged for surveillance of Plaintiff's activities from July 14 through July 21, 2000. (AF No. 8.1). On July 21, 2000, Dr. Pitts summarized Plaintiff's medical condition as follows:

> [Plaintiff] is a 46 year old male who for the last several months has complained of significant fatigue and lack of energy. He has been treated for anxiety and depression by Dr. Hagemeyer. A note from Dr. Hagemeyer (see correspondence dated 5-24-00) suggested that this pt. was "tired all of the time" and he mentioned in his note that the pt. suffered fatigue that could not be explained by mental illness. He is presently on Klonopin and Paxil . . . . Since that time we began to embark on a possible medical explanation and these are the pertinent findings up to this point. . . . [Dr. Pitts described a series of tests run on Plaintiff and the results of those tests]. . . . He is also to see Dr. Ron Stroud for a second opinion as no clear medical problem has been found. He was empirically put on a hypoglycemic diet even though what was tried

---

[2] Plaintiff originally reported symptoms of fatigue at the ACIPCO clinic on August 31, 1979. (AAF No. 2.1). He also complained of fatigue on December 9, 1982; July 30, 1991; August 2, 1997; September 8, 1997; September 22, 1997; July 27, 1998; September 16, 1999; October 19, 1999; February 15, 2000; and continuously during the summer of 2000. (AAF No. 2.2).

> was unquestionably satisfied during the five hour glucose tolerance test. . . . At this juncture, the only significant finding that has been revealed has been an abnormal Epstein-Barr titer, otherwise, pt. has depression and I have no other explanation for his symptoms.

(AF No. 10).

Dr. Ron Stroud's report of Plaintiff's medical condition was similarly inconclusive:

> Basically he states for 2-3 years he has had excessive fatigue and cannot really do anything without tiring. He has no true muscle weakness or soreness. He has no real dyspnea and no chest pain. It makes no difference if it is a.m. or p.m. and it makes no difference if the weather is hot or cold. . . . Extensive laboratory studies have shown significant abnormalities other than the diagnosis of hypothyroidism a couple of years ago based on the increased TSH . . . . The patient also has extensive neuropsychiatric problems and is followed for depression. . . . The most likely etiology [of Plaintiff's fatigue] is depression, however the above studies could explain his symptoms. I certainly can, at the time, think of no other medical problem that would support his symptoms. His DTR's are normal. He does not fatigue with repetitive stimulation, which would go against myasthenia, for which his symptoms do not fit. He also has some increased sleepiness in the daytime, but really does not seem to have obstructive sleep apnea, which could of course cause excessive fatigue. A sleep study might be worthwhile of [sic] the above studies are unremarkable.

(AF No. 11).

On July 27, 2000, Plaintiff met with Leann Barr, ACIPCO's director of human resources, and Leon Eskridge, an EEO officer, to discuss Plaintiff's ability to return to his position as a crane operator or to a transitional duty assignment. (AF No. 12.1). Plaintiff told them that he could not return to his position as crane operator or perform a transitional duty assignment because of his lack of energy and stamina. (AF No. 13.1). On July 31, 2000, Plaintiff's supervisors, Charles Tuggle and Ron Kern, viewed the surveillance tape and stated that, *in their opinion*,[3] the work that Plaintiff was performing on the tape was more demanding than the work required in his regular job. (AF No.

---

[3] Plaintiff admits this fact only to the extent that it expresses the opinions of Tuggle and Kern.

14.1). Dr. Pitts also viewed the tape that day and concluded that, *in his opinion*,[4] the activities depicted on the video were inconsistent with what Plaintiff had reported as his daily activities during his doctor's visits. (AF No. 15.1). Dr. Stroud came to the same conclusion as Dr. Pitts when he viewed the video on August 9, 2000.[5]

Plaintiff collected a total of $8,765.25 in sick pay benefits from ACIPCO for the period that he missed work between March 14, 2000, and August 18, 2000. (AF No. 16.1). On August 14, 2000, Tuggle, supervisor of the melting department, referred Plaintiff's case to ACIPCO's disciplinary committee and recommended that he be discharged for violating plant rule number 7,[6] which prohibits providing false information to ACIPCO and its doctors in order to obtain sick pay. (AF Nos. 17.1, 18.1). On August 18, 2000, the Disciplinary Committee, which is comprised of both management and non-management ACIPCO employees, unanimously decided to terminate Plaintiff's employment. (AF No. 19.1).

On September 24, 2001, Plaintiff completed and submitted an application requesting a disability pension. (AF No. 32.1). In his application, Plaintiff stated that he was seeking disability benefits because "Doctors have diagnosed me with Hypothyroidism, Chronic Fatigue, Depression,

---

[4] Plaintiff admits this fact only to the extent that it expresses the opinion of Dr. Pitts.

[5] Plaintiff admits this fact only to the extent that it expresses the opinion of Dr. Stroud.

[6] Plant rule number 7 prohibits the following:

> Falsification of employment, personal, or Company records or making false report or providing false information which could increase Company costs or liability; including but not limited to unfounded claims for unemployment compensation.

(AF No. 17.1).

and Carpal tunnel syndrome. I had been off work by Doctor's orders before I was terminated, and I'm still under Doctor's care." (AF No. 33.1). On October 31, 2001, Barr referred Plaintiff's application to the Maximum Medical Benefits ("MMB") Committee along with a series of questions regarding Plaintiff's capacity for work as of the date of his termination. (AF No. 34.1). The MMB Committee met on November 7, 2001, and came to the following conclusions based on the questions from Barr:

> Plaintiff had been diagnosed with anxiety/depression, for which his prognosis was fair; hypothyroidism, for which his prognosis was good; hypoglycemia, for which his prognosis was good; and fatigue, for which his prognosis was fair. All of Plaintiff's conditions were treatable, although the fatigue was being investigated further, and Plaintiff had no permanent limitations as a result of his condition. Plaintiff was not permanently and totally disabled from performing either his regular job as a crane operator or another job at ACIPCO for which he was qualified because "his activity level and the tasks he performed around his home and his work for another business during his medical leave of absence from ACIPCO were inconsistent with a claim for total and permanent disability."

(AF No. 35).[7]

Barr informed Plaintiff of ACIPCO's decision to deny his claim for disability pension benefits in a letter dated November 15, 2001. (AF No. 36.1). Plaintiff submitted a notice of his intent to appeal the denial on November 27, 2001, and later informed Barr that he did not intend to submit any additional documentation or information for consideration in that appeal. (AF No. 37.1).

On December 5, 2001, Barr wrote to ACIPCO Vice President of Finance and Treasurer John Cook, requesting that he call a special meeting of the Pension Board to review Plaintiff's appeal. (AF No. 38.1). Barr submitted the following documents to the Pension Board for consideration in Plaintiff's appeal: Plaintiff's September 17, 2001 request for a disability pension; the minutes from

---

[7] Plaintiff admits that this fact accurately summarizes the administrative record but denies the truth of this allegation.

the Discipline Committee's August 18, 2000 meeting; Barr's October 31, 2001 request that the MMB Committee review Plaintiff's claim and the MMB committee's November 7, 2001 letter of determination; Barr's letter to Plaintiff dated November 15, 2001 informing him that his claim had been denied; and Plaintiff's November 27, 2001 letter of appeal. (AF No. 39.1). Barr also recommended that Dr. Pitts attend the appeal and bring with him Plaintiff's medical records, which were reviewed by the MMB Committee. (AF No. 39.2). The Pension Board met on December 12, 2001, and unanimously determined that Plaintiff's "medical limitations at the time of his termination of employment were not such as to cause him to be wholly and permanently incapable of performing work for ACIPCO for which he is suited by reason of his education, training, and experience." (AF No. 40.1).[8] On January 10, 2002, Barr sent Plaintiff a letter informing him of the Pension Board's decision. (AF No. 41.1).[9]

In October 2002, Plaintiff requested reconsideration of his application for a disability pension. (AF No. 42.1). In support of his second appeal, Plaintiff submitted a March 22, 2002 Notice of Decision by the Social Security Administration determining that he was disabled, as that term is defined in the Social Security Act, as of March 14, 2000. (AF No. 43.1; AAF 12.1). He also submitted additional medical records and information from Dr. Stuart C. Tieszen, his psychiatrist who is not associated with ACIPCO, showing treatment that was provided in January 2002. (AF No. 43.1). Barr submitted this additional information to the MMB Committee for review to see if it would change its initial determination. (AF No 44.1). On December 2, 2002, Dr. Pitts advised Barr

---

[8] Plaintiff admits that this fact accurately summarizes the administrative record but denies the truth of this allegation.

[9] Plaintiff admits that this fact accurately summarizes the administrative record but denies the truth of this allegation.

that the MMB Committee had considered the additional evidence and determined that Plaintiff's "voluntary physical activity at another business while on medical leave, as well as notable physical exertion outside of his house and in other parts of the city, were inconsistent with the claim for total and permanent disability at that time." (AF No. 45.1).[10] Barr sent Plaintiff a letter informing him of the Board's decision on December 9, 2002. (AF No. 46.1). Plaintiff filed a complaint commencing the instant case on November 14, 2003. (AF No. 47.1).

## IV.   Applicable Substantive Law and Analysis

### A.   ERISA Standard of Review

The Eleventh Circuit has articulated three different levels of scrutiny in cases involving benefits denials by the administrator of an ERISA plan. See, e.g., Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003). First, in cases where the administrator has no discretion under the plan to determine eligibility for benefits or to construe the terms of the plan, the court reviews the denial decision de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Second, where the administrator does have such discretion, its decision to deny benefits is, as a general matter, afforded substantial deference and subjected to a "pure" arbitrary and capricious standard of review. See Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1558 n.1 (11th Cir. 1990). However, where a plan administrator that is vested with such discretion also has a conflict of interest,[11] this deferential review is adjusted to a "heightened" arbitrary and capricious

---

[10] Plaintiff admits that this fact accurately summarizes the administrative record but denies the truth of this allegation.

[11] A plan administrator has a conflict of interest where it retains control over the decision-making process and also pays the relevant benefits out of its own funds. See Brown, 898 F.2d 1556 at 1566-67.

standard of review. See id. at 1566-67. This standard affords the administrator's decision appreciably less deference than it would receive absent the conflict of interest. Id. This "heightened" level of scrutiny applies regardless of whether the dispute in question turns on a question of fact or on the proper construction to be given the plan. See Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003).

In its May 4, 2005 order (Doc. #26), this court determined the standard of review to be applied in this case. For the reasons stated in that order, the court chose to apply the "pure" arbitrary and capricious standard of review. In the order, the court also limited the scope of discovery in the instant case in accordance with the Eleventh Circuit's mandate that a district court's review under the arbitrary and capricious standard is limited to those facts that were before the claims administrator at the time the benefits decision was made. See, e.g., Lee v. Blue Cross & Blue Shield of Alabama, 10 F.3d 1547, 1550 (11th Cir. 2004); Jett v. Blue Cross & Blue Shield of Alabama, 890 F.2d 1137, 1139 (11th Cir. 1989). Thus, the court's review on summary judgment was limited to the plan documents and the administrative record.[12]

**B.     Application of the Arbitrary and Capricious Standard of Review**

The court now turns to ACIPCO's decision to deny Eady's claim for disability pension benefits and reviews that determination using the arbitrary and capricious standard.[13] As outlined

---

[12] The court did not consider the affidavit of Leann Barr, which is dated June 20, 2005, or the declarations of Dr. Ashley Hagemeyer or Dr. Richard Beth because those declarations were not part of the administrative record considered by the claims administrator at the time the benefits decision was made.

[13] In Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

in Williams, the first step in applying this standard requires the court to determine whether the claim administrator's decision to deny benefits was "wrong" based on a de novo review. Williams, 373 F.3d at 1138. A decision is "wrong" when the court disagrees with it. See id. If the court finds that the decision was not "wrong," the administrator prevails. Id. If the court determines that the decision was "wrong," the court will proceed to the second step in the analysis: determining whether the decision was supported by "reasonable grounds." Id. If no reasonable grounds exist, the court ends its inquiry and reverses the administrator's decision. Id. If reasonable grounds do exist, in cases such as this that do not involve a conflict of interest, the administrator's decision will be affirmed. Id.

---

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision).

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams, 373 F.3d at 1138 (footnotes omitted).

First, the court must decide if ACIPCO's decision to deny Eady disability pension benefits was de novo wrong. ACIPCO claims that it denied Eady's request for disability pension benefits because he was not totally and permanently disabled within the meaning of the plan. ACIPCO based its determination on (1) surveillance videos of plaintiff performing certain activities outside his home (*i.e.*, mowing the grass and cleaning box fans) and on his brief attempt to work as a convenience store clerk, and (2) Dr. Pitts' assessment that Eady's conditions were treatable and not permanent. Plaintiff argues that ACIPCO's decision was "wrong" because (1) the fact he was videotaped during times in which he was performing certain physical activities does not prove that he is not totally and permanently disabled because the nature of his illness is such that he does not know how much work he will be able to perform each day, and (2) he submitted medical evidence from two psychiatrists – one who worked for ACIPCO and one who was independent – and from an independent clinical psychologist that indicated he was totally and permanently disabled.

Courts dealing with disability benefits based upon chronic fatigue syndrome ("CFS") have widely recognized that condition is difficult to diagnose and treat. See, e.g., Cook v. Liberty Life Assurance Co., 320 F.3d 11, 21-22 (1st Cir. 2003); Wilkins v. Hartford Life and Accident Ins. Co., 299 F.3d 945, 947 n.1 (8th Cir. 2002); Friedrich v. Intel Corp., 181 F.3d 1105, 1112 (9th Cir. 1999); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442 (3d Cir. 1997); Sisco v. Sullivan, 10 F.3d 739, 744 (10th Cir. 1993); Howell v. Quorum Health Group, Inc., CV-99-PT-1842-M, slip op. at 9-12 (N.D. Ala. Dec. 20, 1999) (discussing CFS and several cases dealing with the award of long-term disability benefits to CFS sufferers); see also CENTERS FOR DISEASE CONTROL, CHRONIC FATIGUE SYNDROME, http://www.cdc.gov/ncidod/diseases/cfs/. In an opinion dealing with the denial of long-term disability benefits for a CFS sufferer, the Honorable Robert Propst on this court recognized that:

>there is no "dipstick laboratory test for chronic fatigue syndrome. CFS is considered an exclusion disease, which requires a physician to rule out other clinically determined causes of the patient's ailments. . . . CFS is, at this point, a recognized disease which shirks objective medical evidence. An extended medical history of "nothing-wrong" is not unusual for a patient ultimately found to be suffering from the disease.

Howell, slip op. at 9-10 (internal quotations omitted). In light of this, most courts agree that a claimant is not required to offer "objective" medical evidence to support a claim for long-term disability benefits based on a diagnosis of chronic fatigue syndrome. See, e.g., Cook, 320 F.3d at 21-22; Wilkins, 299 F.3d at 947 n.1; Mitchell, 113 F.3d at 442.[14]

While ACIPCO did not explicitly deny Eady's claim because of his failure to present objective medical evidence of his chronic fatigue syndrome, it essentially failed to take into account the nature of his illness in denying his benefits. ACIPCO primarily based its denial of Eady's claim on its determination that Eady's "voluntary physical activity at another business while on medical leave, as well as notable physical exertion outside of his house and in other parts of the city, were inconsistent with the claim for total and permanent disability." (Admin. R. at 45.) However, engaging in such activities for short periods of time does not necessarily indicate that an individual would be able to maintain a normal work schedule. As the Third Circuit noted in Mitchell,

>CFS does not disable an individual afflicted with it from performing particular, isolated activities, but rather prevents him from performing all activities for any *prolonged period of time*. Thus, it is not inconsistent, given the characteristics of CFS, for Mitchell's doctor to conclude that Mitchell was totally unable to engage in substantial gainful activity, even though his ability to perform isolated activities such as standing, pushing, pulling, and communicating was only "somewhat" limited.

Mitchell, 113 F.3d at 441 (emphasis in original).

---

[14] The Eleventh Circuit has not spoken on this issue.

The administrative record indicated that Eady could perform physical tasks, such as yard work, for only about two hours at a time before becoming too exhausted to continue and that if he exerted himself too much one day, he might not be able to do anything the next day. (Admin. R. at 252.) This condition would make it extremely difficult, if not impossible, to maintain a normal work schedule. Drs. Beth, Hagemeyer, and Tiezen all concluded that Plaintiff's CFS, coupled with his major depression, rendered him unable to work. (Admin. R. at 41-42.) Dr. Tiezen, an independent psychiatrist at Brookwood Medical Center, who hospitalized Eady in January 2002, wrote in a letter dated January 24, 2002:

> It is my professional opinion that at this point in time Mr. Eady is totally disabled from any occupation due to both his physical and psychological illnesses. He is not able to sustain physical or emotional work for any great length of time, and I do not consider him even being able to do part-time work.

(Admin. R. at 28.)

The Social Security Administration agreed with Drs. Beth, Hagemeyer, and Tiezen, finding that Eady was disabled within the meaning of the Social Security Act. (Admin. R. at 40-44.) ACIPCO seems to have based its decision solely on the opinion of one physician, Dr. Pitts, who is also the medical director for ACIPCO, that Plaintiff's condition was treatable and on its assessment that the activities he was performing in the video tape were more physically strenuous than his job. It did not take into account the time Eady actually spent performing those activities, how spaced out the activities were, or the fact that Dr. Hagemeyer recommended he try to engage in such physical activities. (See Admin. R. at 29.) Based on the evidence in the administrative record, it is apparent that Eady has at the very least presented enough evidence to create a question of fact as to whether ACIPCO's decision to deny him long-term disability benefits was indeed de novo wrong.

Accordingly, the court will assume, without deciding, that ACIPCO's decision was de novo wrong and continue to the next step in the analysis.

Next, the court's analysis focuses upon whether "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett, 890 F.2d at 1139. In Brown v. Blue Cross and Blue Shield of Alabama, Inc., 898 F.2d 1556, 1567 (11th Cir. 1990), the Eleventh Circuit explained the application of the pure arbitrary and capricious test in Fine v. Semet, 699 F.2d 1091 (11th Cir.1983):

> [T]he plan committed benefits determinations to the sole discretion of the trustees. We found that "after [the beneficiary] met his initial burden of offering evidence of facially inconsistent treatment, the burden shifted to the trustees to show why they acted as they did." Id. at 1095. We focused on the articulated reasons given by the trustees and, given the absence of any argument or indicia of conflicting interests or improper motives, we noted that "[t]he reasons need not be compelling, only sufficient to take them out of the arbitrary mold." Id. The trustees stated they were concerned with the impact of the beneficiary's request on the financial status of the fund generally and other beneficiaries specifically. We accepted their rationale as a judgment on their part designed to implement the statutory "duty [imposed] on fiduciaries to act solely in the interest of plan participants and beneficiaries." Id.

898 F.2d at 1567 (footnote omitted). Therefore, in the absence of any possible conflict of interest on the part of an administrator, the explanation behind a benefits determination need only meet a minimal threshold level of sensibility to satisfy the greatest discretionary standard afforded under ERISA. That the evidence contained in record would also sensibly support an alterative determination is of no legal consequence in the context of an administrator equipped with absolute arbitrary and capricious decision-making authority.

Indeed, "[a]s long as a reasonable basis appears for [the administrator's] decision, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." Jett, at 890. Further, the First Circuit has held that, although an administrator cannot

16

require a claimant to provide objective medical evidence of CFS and similar elusive illnesses, it may require objective evidence that the illness renders the claimant unable to work. Boardman v. Prudential Life Ins. Co. of Am., 337 F.3d 9, 17 n.5 (1st Cir. 2003). The court noted that "[w]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." Id.

In the instant case, ACIPCO does not dispute Eady's diagnosis of CFS. In fact, Dr. Pitts concurred that Eady suffered from that condition. Indeed, the determination of the MMB Committee and the Pension Board was based on Dr. Pitts' finding that Eady's CFS did not render him "wholly and permanently incapable of performing work for [ACIPCO] for which [he] is suited by reason of his education, training and experience." (See Admin. R. at 77.) Dr. Pitts' conclusions coupled with the week-long surveillance of Eady's activities suggested that Eady did not objectively suffer from symptoms that would render him incapable of working. Thus, while ACIPCO need only provide the court with a logical basis for denying Plaintiff's benefits claim, it has premised its non-disability decision partially upon surveillance tapes that objectively capture Plaintiff engaging in activities that are in conflict with his claims that he is suffering from a disabling condition. In the court's view, this type of evidence provides a rational basis for ACIPCO's determination – even if ACIPCO's decision was wrong, it was nevertheless reasonable under a pure arbitrary and capricious standard. Therefore, in light of the entire record, the court concludes that ACIPCO had a non-arbitrary and non-capricious basis for its determination. And based upon this conclusion, the court finds that there are no material issues of fact remaining and that ACIPCO is entitled to judgment as a matter of law.

## V.    CONCLUSION

As analyzed above, as no reasonable trier of fact could conclude on the record taken in a light most favorable to Plaintiff that Defendant's decision to deny Eady's long-term disability benefits was arbitrary and capricious, summary judgment is due to be entered in favor of ACIPCO. A separate order shall be entered.

**DONE** and **ORDERED** this ____19th____ day of January, 2006.

                                                        **R. DAVID PROCTOR**
                                                        UNITED STATES DISTRICT JUDGE